IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JOSEPHINE GRAHAM, on behalf of herself and all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>UNIVERSITY OF MICHIGAN, and THE REGENTS OF THE UNIVERSITY OF MICHIGAN,<br><br>     Defendants. | **CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

1.      "The patient-physician relationship involves a solemn commitment and trust."[1] "Without trust, how could a physician expect patients to reveal the full extent of their medically relevant history, expose themselves to the physical exam, or act on recommendations for tests or treatments?"[2]

2.      For decades, the University of Michigan ("U of M") allowed and enabled a physician in its employ, Dr. Robert E. Anderson ("Anderson") to continuously violate that solemn trust. In so doing, U of M itself violated the trust of thousands of students.

---

[1] University of Michigan President, Mark Schlissel Statement on Sexual Misconduct at February 2020 Board of Regents Meeting (February 20, 2020).
[2] Susan Dorr Goold, MD, MHSA, MA, *Trust, Distrust and Trustworthiness: Lessons from the Field*, 17 J. GEN. INTERNAL MED. 79, 79–81 (2002) (citations omitted).

3.     While employed as a physician by U of M from 1966 until 2003, Anderson used his position to repeatedly and regularly sexually assault university students. Anderson violated these vulnerable student patients by sexually abusing and molesting them in the guise of providing medical care. He used his position to put students in a place of complete vulnerability: naked or partially unclothed in a closed examination room with the expectation that physical contact would occur solely for purposes of medical treatment.

4.     Almost immediately following Anderson's hiring in 1966, U of M received complaints from students about Anderson sexually assaulting them during the course of putative medical examinations.[3]

5.     U of M ignored or suppressed these complaints, and in many cases retaliated against those who were brave enough to complain about Anderson's misconduct.[4]

6.     Despite knowing about Anderson's inappropriate and predatory conduct, U of M continued to give him unfettered access to vulnerable students and the ongoing opportunity to abuse them.

---

[3] *See* WilmerHale, Report of Independent Investigation: Allegations of Sexual Misconduct by Robert E. Anderson (May 11, 2021) (hereinafter the "Anderson Report") at 46–47, Exhibit A.
[4] *Id.* at 33–55.

7.     Even as numerous supervisors and administrators became aware of Anderson's harmful conduct, U of M never terminated Anderson's employment.[5]

8.     In 1979, after receiving repeated complaints that Anderson was sexually assaulting male students during medical examinations on campus, U of M did nothing but transfer Anderson from his position as the Director of University Health Services ("U of M Health Services") to Senior Physician with U of M Health Services.[6]

9.     U of M also allowed Anderson to continue in his position as Athletic Physician, where he repeatedly sexually assaulted male student-athletes until he retired in 2003. U of M student-athletes were required to see Anderson as part of their athletic training.

10.     Sadly, the decades-long Anderson debacle was not a one-off for the U of M culture, nor is it a relic of the past. After Anderson left campus, U of M did not adequately reform its culture. Rather, U of M harbored another serial predator, Martin Philbert, on its campus from 1995 until 2020—just last year—and Philbert was promoted to U of M's second highest-ranking position despite knowledge of his sexual misconduct.[7] In response to an investigation into Philbert's alleged

---

[5] *Id.* at 33–46.
[6] *Id.* at 36–46.
[7] *See* WilmerHale, Report of Independent Investigation: Allegations of Sexual Misconduct by Martin A. Philbert (July 31, 2020) (hereinafter, the "Philbert Report"), Exhibit B.

sexual misconduct, U of M admitted it "has fallen far short of creating a culture that rejects harassment and misconduct and ensures that no one in our community fears retaliation for reporting."[8] [9]

11.     It is clear that U of M continues to lack appropriate and sufficient policies and procedures to prevent sexual violence on campus, and fails to adequately enforce those policies and procedures. As a result, U of M President Mark Schlissel concedes, "[t]he number of sexual assaults and misconduct cases continues to be too high at U-M . . . ."[10]

---

[8] *A Message from President Mark S. Schlissel on the Philbert Investigation Report*, OFFICE OF THE PRESIDENT (Aug. 3, 2020), https://president.umich.edu/news-communications/letters-to-the-community/a-message-from-president-mark-s-schlissel-on-the-philbert-investigation-report/.

[9] Anderson and Philbert are not the only examples of U of M's systemic mishandling of sexual misconduct reports against its faculty. *See, e.g.*, Julia Jacobs and Zachary Small, *Past Students Say Professor of Rock 'n' Roll Sexually Harassed Them*, N.Y. TIMES (last visited May 20, 2021), https://www.nytimes.com/2021/04/23/arts/music/university-of-michigan-bruce-conforth.html, Exhibit C (reporting on U of M's mishandling of sexual harassment allegations against a professor); Kate Wells, *What Happened After a U of M Music Professor was Arrested on Sex Abuse Charges*, NPR (last visited May 20, 2021) https://www.michiganradio.org/post/what-happened-after-u-m-music-professor-was-arrested-sex-abuse-charges, Exhibit D (reporting that it took more than a year for U of M to respond to a report of statutory rape by one of its professors sent in 2017 to the then-dean).

[10] *U-M Seeks Input on Comprehensive Sexual Misconduct Policy; AAU Survey Results Shares*, OFFICE OF THE PRESIDENT (Oct. 15, 2019), https://president.umich.edu/news-communications/letters-to-the-community/u-m-seeks-input-on-comprehensive-sexual-misconduct-policy-aau-survey-results-shared/.

12. U of M's failure to have or enforce appropriate policies and procedures to prevent sexual violence on campus creates an environment in which current (and future) students face a real, immediate, and direct threat of sexual violence.

13. Because of Defendants' conduct, Plaintiff and Class members face a real, immediate, and direct threat of sexual assault, sexual harassment, and emotional trauma.

## I.   JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States.

15. Venue is proper in this District under 28 U.S.C. § 1391(a)–(d) because, *inter alia*, substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

## II.   PARTIES

### A.   Plaintiff Josephine Graham

16. Plaintiff Josephine Graham is a resident of Ann Arbor, Michigan, and currently a junior at U of M.

17. Graham is aware of serious incidents of sexual violence that have occurred at U of M, including but not limited to the decades of abuse by Anderson, and she is aware that they were precipitated by Defendants' failure to have or

enforce appropriate policies and procedures to prevent, and sufficiently respond to, sexual violence on campus.

18.     Graham is concerned and fearful for her own safety and that of her fellow students due to the real, immediate, and direct threat of sexual assault, sexual harassment, and emotional trauma they face because of Defendants' failure to have or enforce appropriate policies and procedures to prevent, and sufficiently respond to, sexual violence on campus.

19.     Indeed, because of that concern and fear, Graham is an active member of the U of M student group Students Demand Representation, which, among other things, advocates for U of M to implement and enforce appropriate policies and procedures to prevent, and sufficiently respond to, sexual violence on campus.

**B.     Defendants**

20.     Defendant U of M was at all relevant times and continues to be a public university organized and existing under the laws of the State of Michigan.

21.     The Regents of the University of Michigan ("Board of Regents") is a body corporate, with the right to be sued, vested with the government of the university. M.C.L. § 390.3 and 390.4.

22.     The Board of Regents is the governing body of U of M.

23.     The Board of Regents is responsible for setting and approving all public policy at U of M, including sex discrimination policy.

24.     Defendants U of M and Board of Regents are collectively referred to herein as the "Defendants."

25.     Defendants receive, and at all relevant times received, federal financial assistance and are therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, et seq.

### III.   FACTUAL ALLEGATIONS

**A.   For Decades, U of M has Perpetuated a Culture of Silence Around Sexual Violence on Campus and Failed to Prevent Sexual Harassment and Abuse.**

**1.   Anderson's history of employment and sexual predation at U of M.**

26.     From 1966 until 2003, U of M employed Anderson as a physician.

27.     Throughout his employment at U of M, Anderson treated students on U of M's Ann Arbor campus.

28.     During his tenure at U of M, Anderson held numerous titles, including Director of Health Service, Senior Physician with Health Service, and Athletic Senior Physician.

29.     In his roles with U of M Health Service, Anderson regularly saw students as patients for general health-related inquiries, medical ailments, physical examinations, prescription drug consultations, and military draft consultations.

30.     In his role as Athletic Physician, Anderson treated members of U of M sports teams, including the wrestling, football, hockey, and swim teams, for

nearly every medical ailment, complaint, and injury as their U of M-assigned internist. He served as one of their first medical points of contact no matter the injury or ailment at issue, including everything from a cold to broken bones. Indeed, student-athletes were required to see Anderson even when they were not injured; regular physicals and checkups with Anderson were required for all student-athletes.

31.    In all of these roles, and throughout the entirety of his employment with U of M, Anderson regularly and repeatedly sexually assaulted, abused, and molested students by engaging in nonconsensual sexual touching, assault, and harassment, including but not limited to medically unnecessary genital manipulation and digital anal penetration.[11]

### 2.    U of M students (and their parents) entrusted their medical care to U of M.

32.    Experts believe health is an important factor for academic achievement in higher education.[12] "Health complaints limit students' capacity to perform adequately at university."[13] Thus, a university's promotion of health and well-being of its students promotes effective learning.[14]

---

[11] Exhibit A, the Anderson Report at 25–29.

[12] Walid El Ansari & Christiane Stock, *Is the Health and Wellbeing of University Students Associated with their Academic Performance?* 7 INT'L J. ENVTL. RES. PUB. HEALTH 509, 509–527 (2010) (citations omitted).

[13] *Id.*

[14] *Id.*

33.     Trust is essential to both physician and patient.[15] "Without trust, how could a physician expect patients to reveal the full extent of their medically relevant history, expose themselves to the physical exam, or act on recommendations for tests or treatments?"[16]

34.     "Presumed consent is a critical manifestation of trust that makes possible much of routine doctor visits."[17] Absent a presumption of trust, patients might avoid essential medical care.[18]

35.     "Important as it is to measure trust in individual clinicians and the actions and circumstances that affect it, it is equally important, in today's health system, to study (empirically and normatively) trust and trustworthiness in organizations and institutions."[19]

36.     Knowing young students would place their trust in its physicians, Defendants had a duty to ensure that Anderson used his trusted position and the safe confines of a doctor's exam room in U of M's Athletic Department and U of M Health Services consistent with the standard of care and certainly not to abuse that trust through the molestation of students.

---

[15] Dorr Goold, *supra* note 1.
[16] *Id.*
[17] *Id.* (citing Ruth Faden & Tom Beauchamp, A HISTORY AND THEORY OF INFORMED CONSENT 274–80 (Oxford Univ. Press 1986)).
[18] *Id.*
[19] *Id.*

### 3. U of M betrayed students' trust and demonstrated a pattern of indifference to sexual harassment and abuse.

37. Throughout Anderson's tenure at U of M, beginning in 1966, U of M repeatedly received complaints about Anderson's sexual misconduct and predation.[20] But U of M just concealed Anderson's misconduct and continued to allow Anderson access and opportunity to abuse U of M students until he voluntarily retired in 2003.[21] In so doing, U of M put its own reputation above the safety of its students.

38. Moreover, U of M's lack of and/or failure to enforce adequate policies and procedures for the proper response to on-campus sexual assaults of its students exacerbates and amplifies the trauma of the actual assault due to institutional betrayal.

39. The term "Institutional Betrayal" refers to wrongdoings perpetrated by an institution upon individuals dependent on that institution, including failure to prevent or respond supportively to wrongdoings by individuals (e.g. sexual assault) committed within the context of the institution.[22]

---

[20] Exhibit A, the Anderson Report at 33–46.

[21] *Id.*

[22] Jennifer J. Freyd, *Institutional Betrayal and Institutional Courage*, https://dynamic.uoregon.edu/jjf/institutionalbetrayal/; *See also* Carly Parnitzke Smith & Jennifer J. Freyd, *Institutional Betrayal*, 69 AM. PSYCH. ASSOC. 575 (2014).

40.     Indeed, U of M's culture of indifference to the safety and well-being of its students has caused sexual violence to flourish at U of M for decades. This toxic culture continues to thrive to this day.

### 4.     U of M learned as early as 1968 of Anderson's sexual predation of students.

41.     In 1968, it was reported that a then-U of M student, Gary Bailey went for an examination by Anderson, which he later described to the Detroit News as "very traumatic."[23]

42.     Bailey reportedly stated "he (Anderson) had me drop my pants, he felt my penis and genitals, and subsequently, he (Anderson) wanted me to feel his (Anderson's) penis and genitals." Bailey further states, "Back then you did not question a doctor's authority . . . He asked me to pull on his penis."[24]

43.     Bailey reportedly filed a written complaint with the U of M Health Service and filled out a form, complaining that Anderson had dropped his pants and asked him to fondle his genitals during the exam.[25]

---

[23] Kim Kozlowski, *Alum Says He Told UM Of Doctor's Sex Abuse In '68 But Never Got A Response*, THE DETROIT NEWS (last visited May 14, 2021), https://www.detroitnews.com/story/news/local/michigan/2020/02/20/alum-says-he-told-university-michigan-about-doctor-sex-abuse/4817480002/, Exhibit E.
[24] *Id*.
[25] *Id.*

44.     It was reported that no one from U of M Health Services or any other U of M department followed up with Bailey or contacted him as part of an investigation into Bailey's written sexual assault complaint.[26]

45.     On information and belief, U of M never acted on and/or investigated Bailey's complaint against Anderson.

**5.     U of M was warned again in 1975 about Anderson's sexual predation.**

46.     In 1975, U of M student and scholarship member of U of M's wrestling team, Tad Deluca, gave notice of Anderson's sexual misconduct in a 9-page letter to U of M's head wrestling coach, Bill Johannesen, complaining that "Something [was] wrong with [Anderson]" and "[r]egardless of what you are there for, Dr. Anderson makes you drop your drawers."[27]

---

[26] *Id.*

[27] David Jesse, *Former U-M Wrestler: I blew whistle on U-M doctor in 1975, was dismissed from team*, DETROIT FREE PRESS (last visited May 17, 2021), https://www.freep.com/story/news/education/2020/02/27/robert-anderson-university-of-michigan-tad-deluca-sex-abuse-scandal/4890575002/, Exhibit F; *see also*, Exhibit A, the Anderson Report at 33–35.

47.     Neither U of M, nor any agents of U of M investigated Mr. Deluca's complaints about Anderson's sexual assaults;[28] instead, Defendants stripped Deluca of his athletic scholarship and kicked him off the wrestling team.[29]

48.     In a letter to Mr. DeLuca, U of M Athletic Director Don Canham stated, "[b]ased upon your letter to Coach Bill Johannesen and your decision to 'no longer want to be an athlete,' your financial aid from the University of Michigan will not be in effect for the 1975-76 school year."[30]

49.     Mr. Deluca had to hire an attorney and appeal to U of M's Board of Intercollegiate Athletics to have his scholarship reinstated.[31]

50.     According to the Anderson Report, "Mr. Johannesen does recall hearing some 'scuttlebutt,' joking, and laughing among the members of the wrestling team about Dr. Anderson, such as 'you go to see Dr. Anderson for a sore elbow and he tells you to take your pants down.' But Mr. Johannesen told

---

[28] Ross Jones, *Fmr. U-M coach doesn't recall letter warning of Dr. Robert Anderson's abuse*, WXYZ, (last visited May 14, 2021), https://www.wxyz.com/news/local-news/investigations/fmr-u-m-coach-doesnt-recall-letter-warning-of-dr-robert-andersons-abuse, Exhibit G ("Reached by phone, Johannesen said he does not recall receiving Deluca's letter or ever responding to it.").

[29] Exhibit A, the Anderson Report at 34.

[30] *Id.*

[31] *Id.*

[WilmerHale] that no one ever said, 'Hey, Coach, there's something weird about this doctor.'"[32]

51.    The Anderson Report confirms through interviews with "nearly fifty current and former Athletic Department administrators, coaches, and trainers, and many more student athletes" that in "multiple instances . . . Athletic Department personnel may have heard concerns . . . about Dr. Anderson's conduct in the examining room."[33]

52.    According to the Anderson Report, there are also "a dozen additional instances in which Athletic Department personnel heard jokes or rumors about Dr. Anderson's examinations, some of which highlighted Dr. Anderson's propensity for performing sensitive examinations for no apparent medically appropriate reason. Yet no one in the Athletic Department appears to have recognized what they heard as indicative of abuse or initiated any inquiries into Dr. Anderson's conduct."[34]

### 6.    U of M concealed Anderson's sexual predation upon receiving credible allegations in 1979.

53.    In 1979, then-U of M Vice President of Student Life, and direct supervisor of Anderson, Tom Easthope learned of credible allegations that

---

[32] *Id.* at 35.

[33] *Id.* at 6.

[34] *Id.*

Anderson had assaulted several members of the gay community at U of M and was "fooling around" with male students in the exam room.[35]

54.     According to Easthope, upon hearing the allegations he walked across the campus to Health Services to fire Anderson. When he confronted Anderson about the allegations, Anderson did not deny them.[36]

55.     Easthope initially told detectives that he fired Anderson "on the spot."[37]  Shortly thereafter, however, Easthope said he may have allowed Anderson to resign. He told the officers he believed Anderson had returned to private practice.[38]

56.     In reality, Anderson was never fired and did not leave U of M until retirement in 2003.

57.     On July 28, 2020 and August 4, 2020, Mr. Easthope provided the following testimony, under oath:

    a.     Easthope was the Associate Vice President of Student Services and his supervisor was Henry Johnson, Vice President of Student Services.

---

[35] *Id.* at 36.
[36] *Id.* at 38.
[37] Kim Kozlowski, *UM Official 'Fired' Doctor Accused Of Sex Abuse, But He Stayed On Another 24 Years*, THE DETROIT NEWS (last visited May 18, 2021), https://www.detroitnews.com/story/news/local/michigan/2020/02/21/michigan-doctor-fired-sex-abuse-served-football-team-doctor-24-more-years/4835017002/, Exhibit H.
[38] *Id.*

b.  His boss, Henry Johnson, reported directly to the President of the U of M. *See* Deposition of Thomas Easthope taken in this matter on July 28, 2020 and August 4, 2020 at 29:17–19.

c.  Easthope acted as "COO" of Student Services and Johnson acted as "CEO" of Student Services. *Id*. at 30:5–10. Easthope had access to and the "ear" of U of M presidents, such as President Robben Fleming, for whom U of M's administration building is named. *Id*. at 37:9–10 ("President Fleming relied on me a great deal to communicate with students.").

d.  In his capacity as Associate Vice President of Student Services, Easthope supervised approximately 1600 U of M employees. *Id*. at 31:11–17.

e.  Mr. Easthope had no disciplinary or other issues with Anderson before he learned Anderson was sexually abusing students in the University Health Service exam rooms. *Id*. at 50:1–3.

f.  Easthope was aware that Anderson worked with U of M's Athletic Department. *Id*. at 53:4–7.

g.  Easthope described Anderson as "authoritarian," *id*. at 51:17, and "in a position of supreme authority and power" vis-à-vis U of M students, *id*. at 332:10–11.

h.  Easthope fired Anderson based on a report that Anderson was "fooling around with boys"—i.e., abusing students—in the exam room of the University Health Service. Hearing about the abuse was "absolutely" the worst employee incident he had ever encountered in his professional career. *Id*. at 57:19–22. It was something that "just shocked the hell out of [him]." *Id*. at 60:18–19. "[I]t was a significant event in [his] life…it infuriated [him]." *Id*. at 63:14–18.

i.  Easthope was not aware of U of M having any policies or procedures concerning how incidents of sexual abuse on campus should be reported or handled. *Id*. at 245:21-246:11.

j.  Easthope was infuriated to learn Anderson "was abusing a vulnerable population," so he marched over to Anderson's office intending to fire him. *Id*. at 62:26–63:1; 63:20–21.]

k.   Easthope was so "furious walking across campus (to fire Anderson)" that he considers it "a very, very significant point in [his] life and [] career[.]" *Id.* at 64:14–17.

l.   Firing, "somebody who has got this aura of being a physician and being the head of Health Services" took "some guts, as [he] recall[s]." *Id.* at 87:3–6. Indeed, Anderson was Vice President Johnson's private doctor. *Id.* at 52:14–18.

m.   Easthope had the authority to fire Anderson. *See id.* at 177:18–178:1.

n.   Anderson was the only division head (of Student Services) that Easthope had ever fired. *Id.* at 68:10–12.

o.   Yet Easthope does not recall preparing or ever seeing any written documentation effecting or regarding Anderson's firing. *Id.* at 15–17.

p.   When confronted with the fact that Anderson stayed employed by U of M for 23 years after Easthope fired him, Easthope agreed that overriding his termination decision was wrong: "I believe it would be wrong, yes . . . it was moral authority [to fire Anderson] so I gotta get rid of this guy." *Id.* at 88:25–89:3.

q.   As Easthope's direct supervisor, Johnson also had the authority to fire Anderson after learning of Anderson's misconduct from Easthope. However, despite knowing about Anderson's history of abuse, Johnson "overrode" Easthope's firing of Anderson. *Id.* at 130:10–12; 239:13–22.

r.   Easthope also suggested that Athletic Director Don Canham was involved in overriding Easthope's decision to fire Anderson. *Id.* at 109:25-110:2 ("Don Canham was a bigger man than Henry Johnson and probably 90 percent of the people on the hill."); *id.* at 336:6–7 (Canham was "a voice to be reckoned with at the University of Michigan.").

s.   Still, Easthope was "stunned" that Anderson remained employed by U of M for 23 years after Easthope fired him. *Id.* at 162:22–23.

- 17 -

t.  It was predictable that, if Anderson "were allowed to stay . . . the number [of abused students] would go up." *Id*. at 89:12–15.

u.  Easthope considers Anderson's sexually predatory conduct comparable to the conduct of Dr. Larry Nassar at Michigan State University. *Id*. at 215:10–14 ("when the Nassar thing came up . . . I think I may have said, you know, that we had to get rid of Bob Anderson because of that").

v.  Easthope had the authority to take corrective measures to ensure that Anderson was not able to abuse students. *See id*. at 177:18–178:1. While he attempted to fire Anderson, he failed to report Anderson's misconduct to the proper channels and failed to make sure Anderson's employment at U of M was in fact terminated.

w.  Easthope never asked University Health Services, the Ann Arbor Police, or the Washtenaw County Prosecutor's Office to investigate the extent of Anderson's abuse. And, he failed to notify Michigan's Department of Licensing and Regulatory Affairs ("LARA")—the state professional "licensing agency"—or the U of M Medical School about Anderson's sexual abuse of male students. *See generally*, *id*. at 219–220.

x.  Similarly, Easthope did not inform U of M's Athletic Department about Anderson's sexual abuse of male students or Anderson's "termination," despite knowing "that [Anderson] was working with the athletic department[.]" Easthope figured that because the Athletic Department was out of his "sphere of influence and nothing that [he] had any input about," that it was not something he needed to be "terribly concerned about." *Id*. at 53:4–8.

y.  Easthope told his boss, Henry Johnson, a person who directly reported to the President of U of M, that Anderson was abusing students. *See id*. at 303:25–304:1("I didn't just go knocking off people without Henry knowing about it); 323:11–14 ("(B)ut I did tell him what I knew about [the abuse]").

z.  When asked about his failure—despite the power of his position—to do more, Easthope testified, "We live in a different

- 18 -

time, and it's not like that today. To go out and make
accusations about people, and 'this guy is against gays' or
something wouldn't been very nice to anybody, including
myself, so it is wasn't something you go out and broadcast. I
just didn't want to have to deal with that kind of problem." *Id*.
at 165:25–166:7.

aa.    Indeed, Easthope testified he had other priorities more
important than ensuring Anderson left campus in order to
protect future students from being abused by Anderson: "So in
retrospect, it doesn't sound very forgiving of me, but I had to
move on, I had a lot of things going on every day, and you
know, I suppose you experience having to make a decision and
move on. I can't explain it any other way." *Id*. at 186:18–23.

bb.    Easthope expressed sympathy for students who were abused but
fearful of retaliation if they told anyone about Anderson's
abuse: "If you were a young athlete and you wanted to perform,
you didn't want to get yourself in trouble with anybody, and it's
hard – it would be hard to know that you got yourself in trouble
because of some guy screwing around with you." *Id*. at 171:1–
10; *see also*, *id*. at 171:11–14 ("I can tell you how I would feel,
but I'm not 100 athletes that had their scholarships on the line if
they reported somebody who was revered by their coaches.").

58.    Easthope's affirmative failure to ensure Anderson left U of M's
employment and his affirmative failure to confront his superiors after one or some
of them overrode his termination of Anderson, concealed that Anderson's acts
done in the guise of medical treatment were in fact sexual assaults.

59.    Indeed, according to U of M human resource records, instead of
terminating Anderson, U of M transferred him from Director of Health Services to
a position as Senior Physician with Health Services, effective January 14, 1980.

The reason for his transfer as stated in Anderson's personnel file was "resuming former position."[39]

60.    Despite U of M's knowledge of Anderson's misconduct, Anderson continued to work as a physician with U of M and as a physician in U of M's Athletic Department. Indeed, according to longtime U of M athletic trainer Russell Miller, after Anderson's transfer from U of M Health Services Director, Athletic Director Canham, a legendary and powerful figure at the U of M, "worked out a deal" which increased Anderson's role in the Athletic Department.[40]

61.    U of M, through its most senior administrators, employed a false artifice and misrepresentation that Anderson was an ethical and competent doctor. In that regard, U of M continued to hold Anderson out as a leader in its healthcare community. U of M praised Anderson in its publication, Volume III of the President's Report of The University of Michigan for 1979–1980.[41]

62.    The U of M publication states in its "Acknowledgement" preface: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson

---

[39] Affidavit for Search Warrant by Detective Ryan A. Cavanaugh, dated November 15, 2018, Exhibit I.

[40] Officer Narrative Dated November 9, 2018, U of M Division of Public Safety & Security, Exhibit J.

[41] Excerpts from *President's Report of The University of Michigan*, Vol. III, (1979–1980), Exhibit K.

resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine . . . his many contributions to health care are acknowledged. . . . The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him." It further confirms that after his transfer, Anderson "continue[d] as a senior physician on the medical staff" at U of M.[42]

63.    Thereafter, Anderson had free rein to abuse thousands of students with impunity.

### 7.    U of M continued to conceal Anderson's sexual predation upon receiving further credible allegations.

64.    Even upon learning of more allegations, U of M continued to protect Anderson and its own reputation instead of the safety of its students.

65.    In late 1979, two psychological counselors in U of M's Counseling Services Office, Jane Hassinger and Marvin Parnes informed Easthope about disturbing information they received.[43]

66.    In 1980, U of M student Keith Moree complained to Easthope in a meeting that Anderson engaged in sexual misconduct during an examination.[44] According to Mr. Moree, Easthope said this was a sad situation and that Anderson

---

[42] *Id.*
[43] Exhibit A, the Anderson Report at 36.
[44] *Id.* at 42–43.

probably needed professional help, but that if Anderson were fired, it would cause financial hardship for Anderson and his family. Easthope proposed moving Anderson to an administrative position and keeping Anderson away from students until his retirement, to which Mr. Moree agreed.[45] However, no such arrangement was ever made, and Anderson continued to have access to students until his retirement.[46]

67.    In 1996, Anderson disclosed to U of M a lawsuit against him for sexual assault.[47] Public records of the lawsuit show that a female plaintiff sued Anderson in August 1995 in Washtenaw County Circuit Court for assault and battery and tortious infliction of emotional distress.[48] In her complaint, the plaintiff alleged that Anderson touched and manipulated her breasts, performed a rectal examination, and performed a pelvic examination for no appropriate or proper purpose at a pre-employment physical conducted in September 1993.[49] There is no evidence U of M investigated those allegations.[50]

---

[45] *Id.*
[46] *Id.*
[47] *Id.* at 56.
[48] *Id.*
[49] *Id.*
[50] *Id.*

**B.  Current Investigative Reports Confirm U of M's Decades-Long Failure to Adequately Prevent and Respond to Sexual Violence on Campus.**

68.    Two reports issued within the last year by the law firm Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale") show that for decades, U of M perpetuated a culture of silence around sexual violence on campus.[51]

69.    On March 21, 2020, U of M hired WilmerHale to investigate Anderson's sexual misconduct throughout his employment at U of M. Initially, U of M hired the firm Steptoe & Johnson, LLP to conduct the investigation, but decided to engage a different firm, citing Steptoe's previous representation of "prominent clients who were accused of sexual misconduct."[52]

70.    Prior to that, in January 2020, U of M hired WilmerHale to investigate allegations of sexual misconduct against long-time U of M teacher and former provost, Martin Philbert (the "Philbert Report").

71.    The Anderson Report chronicles a pattern of sexual misconduct perpetrated by Anderson. Anderson's sexual abuse and misconduct occurred across his various roles at U of M and throughout his decades-long U of M career—with patients who sought treatment from him at U of M Health Services, with student

---

[51] *See* Exhibit A, the Anderson Report; *see also* Exhibit B, the Philbert Report.
[52] *Statement from the University of Michigan Board of Regents and President Mark Schlissel*, OFFICE OF THE PRESIDENT (Mar. 7, 2020), https://president.umich.edu/news-communications/statements/statement-from-the-university-of-michigan-board-of-regents-and-president-mark-schlissel/.

athletes who were sent to him for required physical examinations, and with medical students he was responsible for teaching. He abused students in his examination room at U of M Health Services, in training rooms at Athletic Department facilities, and in other treatment rooms in U of M medical facilities. Anderson abused men and women, students from different racial backgrounds, undergraduate and graduate students, student athletes, and members of the lesbian, gay, bisexual, transgender, and queer ("LGBTQ") community.[53]

72.    The Anderson Report also confirms U of M knew of Anderson's abuse for decades but failed to stop it.[54]

73.    Likewise, the Philbert Report details decades of sexual misconduct and harassment[55] by Philbert, as well as numerous instances in which U of M was made aware of his abuse but failed to properly respond and intervene to prevent future instances of sexual misconduct.

---

[53] Exhibit A, the Anderson Report at 4.
[54] *Id.* at 5–6.
[55] "[W]e found significant evidence that Philbert engaged in conduct that violated the University's Sexual Harassment policy, Standard Practice Guide ("SPG") 201.89-0, which prohibits sexual harassment by employees, as well as other University policies." The Philbert Report at 5.

**C.**    **U of M Students Face a Real, Immediate, and Direct Threat of Sexual Violence Due to Defendants' Failure to Have or Enforce Appropriate Policies and Procedures to Prevent, and Sufficiently Respond to, Sexual Violence On Campus.**

74.    U of M's failure to have or enforce appropriate policies and procedures to prevent, and sufficiently respond to, sexual violence on campus creates an environment in which students are more likely to face sexual violence.

75.    For instance, almost thirty five percent of undergraduate women, and nearly one out of five students overall, report experiencing nonconsensual sexual touching or penetration while enrolled at U of M.[56] Furthermore, over a quarter of all students—and over thirty eight percent of undergraduate women—report witnessing unwanted sexual misconduct at U of M.[57]

76.    This increased risk of sexual misconduct is a result of Defendants' failure to implement appropriate policies, procedures, and/or enforcement mechanisms for to prevent, and sufficiently respond to, sexual violence on their campus.

77.    The Philbert and Anderson Reports confirm that Defendants' policies and procedures for preventing on-campus sexual assault and harassment remain inadequate. In both reports, upon review of U of M's current policies, practices,

---

[56] *See* 2019 Association of American Universities National Campus Climate Survey on Sexual Assault and Misconduct, University of Michigan Table of Results, Exhibit L at Table 7.1.
[57] *Id.* at Table 1.2.

and procedures, WilmerHale identifies significant flaws and shortcomings and recommends broad overhauls to U of M's policies and procedures for preventing, identifying, and responding to complaints of sexual misconduct on campus.

78.    According to the Philbert Report, U of M policies fail to adequately ensure sexual abuse and harassment reach appropriate U of M officials, fail to adequately ensure full investigations into allegations of sexual misconduct, fail to adequately ensure findings from investigations into allegations of sexual misconduct are based on a full accounting of facts, and fail to ensure personnel decisions are informed by past findings of policy violations.[58]

79.    The Anderson Report confirms U of M has not implemented the necessary policies and procedures to protect students from sexual violence on campus. Upon review of current policies and procedures, the Anderson Report identifies numerous outstanding necessary reform measures including: (1) developing a more robust culture of recognizing and reporting sexual misconduct through training programs; (2) implementing training and policies relating to sensitive examinations; (3) revising how individual departments respond to sexual misconduct issues to increase their accountability; (4) enhancing diligence procedures to ensure that concerning information about physicians is adequately investigated; (5) improving coordination and communications between

---

[58] Exhibit B, the Philbert Report at 77–88.

U of M's Title IX enforcement office and U of M law enforcement; and (6) ensuring U of M's Title IX enforcement office has adequate resources to carry out its responsibilities, especially regarding the investigation and resolution of sexual misconduct reports.[59]

80.      As such, without reform students at U of M will continue to face a real, immediate, and direct threat of sexual violence and sex discrimination under Title IX. [60]

## IV.   **CLASS ALLEGATIONS**

81.      Graham brings this action pursuant to Rules 23(b)(2) and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of herself and the following Class: All current U of M students (the "Class").

82.      The Class consist of thousands of individuals, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members are ascertainable through records maintained by U of M.

---

[59] Exhibit A, the Anderson Report at 63–71.

[60] Indeed, Anderson and Philbert are not the only examples of U of M's systemic mishandling of sexual misconduct reports against its faculty. *See, e.g.*, Jacobs, *supra*, Exhibit C (reporting on U of M's mishandling of sexual harassment allegations against a professor); Wells, *supra*, Exhibit D (reporting that it took more than a year for U of M to respond to a report of statutory rape by one of its professors sent in 2017 to the then-dean).

83.     Graham's claims are typical of the Class. Graham's and Class members' claims are based on the same legal theories and arise from the same unlawful pattern and practice of U of M's failure to implement and enforce appropriate policies and procedures to prevent and properly respond to sexual harassment and assault.

84.     There are many questions of law and fact common to Graham's claims and the Class.

85.     Common questions of fact and law affecting members of the Class include, but are not limited to, whether U of M has appropriate policies and procedures to prevent, and sufficiently respond to, sexual violence on campus.

86.     Graham will fairly and adequately represent and protect the interests of the Class. Graham has retained counsel with substantial experience in prosecuting complex litigation and class actions, including sex abuse cases. Graham and her counsel are committed to vigorously prosecuting this action on behalf of the other respective Class members, and have the financial resources to do so. Neither Graham nor her counsel has any interests adverse to those of the other members of the Class.

V.    **CLAIMS FOR RELIEF**

**COUNT I**
**Violation of Title IX, 20 U.S.C. § 1681,**
*et seq.* **and Request for Injunctive and**
**Equitable Relief**

87.    Plaintiff restates and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

88.    Title IX, 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

89.    Title IX is implemented through the Code of Federal Regulations. *See* 34 C.F.R. Part34 C.F.R. § 106.8(b) provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

90.    Defendants receive, and at all relevant times received, federal financial assistance and are therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, et seq.

91.    As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

92.     Sexual harassment is unwelcome conduct of a sexual nature, including

unwelcome sexual advances, requests for sexual favors, and other verbal,

nonverbal, or physical conduct of a sexual nature.

93.     Title IX covers all programs of a school that receives any federal

financial assistance, and covers sexual harassment-including sexual assault-by

school employees, students, and third parties.

94.     Title IX requires U of M to promptly investigate all allegations of

sexual harassment, including sexual assault and abuse.

95.     U of M had actual knowledge of Anderson's prior sexual harassment

of male students at U of M, beginning in 1968.

96.     U of M's failure to address the substantial risk posed by Anderson,

given prior complaints and reports about his inappropriate conduct, was clearly

unreasonable in light of the known circumstances.

97.     Defendants' continued failure to set appropriate sex discrimination

policy, in light of U of M's failure to address the substantial risk posed by a serial

predator, creates a real, immediate, and direct threat of irreparable harm to Plaintiff

and the Class.

98.     Plaintiff, like all Class members, face a real, immediate, and direct

threat of sexual assault, sexual harassment, and emotional trauma because of

Defendants' failure to have or enforce appropriate policies and procedures to prevent, and sufficiently respond to, sexual violence on campus.

99.    The risk of irreparable harm that Plaintiff and Class members currently face is higher than the general societal risk of these harms, and that increased risk is directly traceable to the actions and inactions of Defendants.

100.    The harms that Defendants put Plaintiff and the Class members at increased risk for are irreparable, because, unlike economic losses, sexual assault, sexual harassment, and emotional trauma cannot be undone or reversed by monetary compensation. Thus, monetary compensation is inadequate to remedy these harms; proactive injunctive relief is necessary to eliminate the increased risk and protect Plaintiff and Class members from being so irreparably harmed.

101.    The common injury currently being suffered by Plaintiff and the Class—being put by U of M at increased risk of sexual assault, harassment, and emotional trauma—will be redressed by the injunctive relief requested here.

102.    Defendants are required under Federal law to protect and aid their students. This includes a duty:

      b.    to protect students from sexual assaults on their campus;

      c.    to set proper policies and guidelines to protect students from sexual assault on their campus;

      d.    to report on-campus sexual assault to the proper authorities;

      e.    to respond properly to sexual assaults that do occur; and

      f.    to supervise and stop their employees from committing wrongful sexual acts with student patients.

103.   Defendants breached and are breaching their duty to Plaintiff and the Class members by failing to set, implement, and enforce appropriate policies and procedures to prevent, or properly respond to, on-campus sexual assaults.

104.   Accordingly, Plaintiff, on behalf of herself and the Class, requests that the Court issue an Order requiring Defendants to implement and enforce best-practice policies and procedures to prevent, and sufficiently respond to, sexual violence on campus.

105.   In crafting her specific injunctive relief demands, Plaintiff intends to consult with experts in best-practices to prevent, and sufficiently respond to, sexual violence on campus, but by way of example, such relief might include:

      g.    requiring Defendants to establish and implement a uniform policy, including training and education for its employees and staff, for how to identify sexual assault;

      h.    requiring Defendants to establish and implement policies and procedures to prevent sexual violence on campus, including student education and messaging, and clear communication of consequences;

      i.    requiring Defendants to establish and implement a uniform policy, including training and education for its employees, professors, and staff, for how to respond to student sexual assault that includes humane and trauma-informed treatment of the alleged victim(s);

      j.    requiring Defendants to track all reports of sexual assault;

k.      requiring Defendants to establish a uniform policy, including training and education for its staff, for how to report sexual assault to the proper authorities, and making reporting of student sexual assault to authorities mandatory;

l.      requiring Defendants to implement pre-hiring background checks of all new personnel, including physicians, who are regularly expected to have direct patient interaction;

m.     requiring Defendants to implement annual verification of credentials of all clinical personnel, including physicians;

n.      requiring Defendants to provide all students accessing U of M Health Services with a consent form informing them of the U of M's commitment and steps taken to prevent any recurrence, along with a brochure outlining what to expect during a visit;

o.      requiring Defendants to create a procedure for anonymous patient feedback concerning U of M Health Services and its personnel;

p.      requiring Defendants to train all U of M Health Services personnel who assist with sensitive examinations annually on best practices for ensuring the safety and comfort of students during sensitive examinations;

q.      requiring Defendants to train all U of M Health Services personnel who are regularly expected to have direct patient contact annually on policies for mandatory reporting of sexual harassment and gender-based violence, bystander training, procedures for referring students to counseling or psychiatric treatment, and the U of M's anti-retaliation policies;

r.      requiring Defendants to provide all students with plain-language notice of how to recognize and report sexual harassment and gender-based violence by a healthcare provider;

s.      appointing an Independent Monitor to supervise and enforce the implementation of the injunctive relief reforms, and report regularly on that progress to the parties and the Court;

t.     requiring Defendants to create a Coordinated Community Response Team ("CCRT") at U of M to assess U of M's culture and existing policies, identify elements that need to be changed, and lead the implementation of those changes to create an effective comprehensive prevention system and oversee and adjust the system on an ongoing basis according to best practice as defined  by the United States Department of Justice Office on Violence against Women and other well-regarded sources;

u.     requiring Defendants to implement a disclosure, reporting, and response systems to be created by the CCRT. The primary goals of the disclosure, reporting, and response system will include: (1) *simplification* to make it clearer and less confusing for victims to know—or find out—how to disclose or report, and to ensure they have to recount the harassing events as few times as possible (ideally only once)—to someone who will respond appropriately and according to whether the victim disclosed or reported, so the victim can easily access needed services; (2) maximization of options for victims to disclose or report; (3) procedural equality for victims once they have reported and an investigation is occurring or is imminent;

v.     requiring Defendants, with input from the CCRT, to inventory the range of victim services and advocacy currently available at U of M to consolidate those services where advisable and/or otherwise to establish a full-time victim services and advocacy office at U of M, which will allow survivors one-stop access to a range of services, including medical, counseling, academic, housing, employment, financial aid, law enforcement, Title IX, and student conduct processes, all through a single office; and

w.     requiring Defendants to create and implement a unified response system for handling, investigation, and record-keeping of all reports of Sexual Harassment and Gender-Based Violence on campus.

## VI.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of all Class members,

prays that this Court:

A.      Certify the Class, name Plaintiff as representative of the Class, and appoint her lawyers as Class Counsel;

B.      Enter judgment against Defendants in favor of Plaintiff and Class members;

C.      Enter appropriate equitable relief as explained in Count I and as the Court deems just, proper, and fair; and

D.      Award Plaintiff her reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b).

 Dated:  May 20, 2021                    Respectfully submitted,

                                        */s/ E. Powell Miller*
                                        E. Powell Miller (P39487)
                                        Sharon S. Almonrode (P33938)
                                        THE MILLER LAW FIRM, P.C.
                                        950 W. University Dr., Suite 30
                                        Rochester, MI 48307
                                        (248) 843-0997
                                        (248) 652-2852
                                        Email: epm@millerlaw.com
                                        Email: ssa@millerlawpc.com

                                        Jonathan D. Selbin
                                        Annika K. Martin
                                        Patrick I. Andrews (admission pending)
                                        LIEFF CABRASER HEIMANN &
                                        BERNSTEIN, LLP
                                        250 Hudson Street, 8th fl.
                                        New York, NY 10013
                                        (212) 355-9500
                                        Email: akmartin@lchb.com
                                        Email: jselbin@lchb.com
                                        Email: pandrews@lchb.com

Joseph G. Sauder
Lori G. Kier
SAUDER SCHELKOPF LLC
1109 Lancaster Avenue
Berwyn, PA 19312
(888) 711-9975
Email: jgs@sstriallawyers.com
Email: lgk@sstriallawyers.com